Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Alexandra Cusano, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

                                   Plaintiffs,

         -against-

MYRTLE AVENUE TRADING, LLC, RAKHMIN
DEKHKANOV and JOHN DOE DEFENDANTS "1"
through "10",

                                   Defendants.
-----------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

       Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Myrtle Avenue Trading, LLC,

Rakhmin Dekhkanov, and John Doe Defendants "1" through "10" (collectively, "Defendants"),

hereby allege as follows:

## INTRODUCTION

1.     GEICO brings this action to recover more than $430,000.00 that the Defendants wrongfully obtained from GEICO and to terminate the Defendants' fraudulent scheme that has exploited the New York "No-fault" insurance system by submitting charges related to medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME") and orthotic devices ("OD") (e.g. lumbar sacral orthosis ("LSO"), cervical traction units, cold compression units ("CCUs"), and continuous passive motion ("CPM") machines) allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.     The Defendants' scheme was committed using a company known as Myrtle Avenue Trading, LLC ("Myrtle Avenue"), which styles itself as a DME retailer that provides and rents DME and OD to Insureds.  Myrtle Avenue is owned by Rakhmin Dekhkanov ("Dekhkanov") who, in conjunction with the John Doe Defendants (as defined below), devised a scheme to obtain medically unnecessary and often forged prescriptions from various healthcare providers (the "Referring Providers") through unlawful kickbacks and other financial incentives. Once these prescriptions were secure, Myrtle Avenue then billed GEICO in excess of $3.5 million for purportedly providing DME and OD (collectively, the "Fraudulent Equipment") and for purportedly renting DME and providing accessories for rental items (collectively, the "Fraudulent Rental Equipment") to Insureds that was medically unnecessary, illusory, and otherwise not reimbursable.

3.     GEICO seeks to recover more than $430,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,500,000.00 in pending No-Fault insurance claims that have been submitted on behalf of the Defendants because:

(i)     The Defendants billed GEICO for Fraudulent Equipment and/or Fraudulent Rental Equipment purportedly provided or rented to Insureds as a result of unlawful financial arrangements between them and with others not presently identifiable;

(ii)    The Defendants billed GEICO for Fraudulent Equipment and/or Fraudulent Rental Equipment that was not medically necessary and was provided – to the extent provided at all – pursuant to prescriptions issued by the Referring Providers because of predetermined fraudulent protocols, which were adopted solely to financially enrich the Defendants rather than to treat the Insureds;

(iii)   The Defendants billed GEICO for Fraudulent Equipment that was provided – to the extent provided at all – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions; and

(iv)   To the extent that any equipment was provided to Insureds, the bills for Fraudulent Rental Equipment submitted to GEICO by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Rental Equipment.

4.     The Defendants fall into the following categories:

(i)     Defendant Myrtle Avenue is a New York corporation that purports to purchase DME from wholesalers, provide Fraudulent Equipment and Fraudulent Rental Equipment to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for providing Fraudulent Equipment and Fraudulent Rental Equipment;

(ii)    Defendant Dekhkanov owns, operates, and controls Myrtle Avenue and uses Myrtle Avenue to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment and Fraudulent Rental Equipment purportedly provided to automobile accident victims; and

(iii)   John Doe Defendants "1" through "10" (the "John Doe Defendants") are citizens of New York and are presently not identifiable but are associated with the Referring Providers and various multi-disciplinary medical offices (the "Clinics") or surgical centers where the Referring Providers operate from (the "Surgery Centers"), both of which purportedly treat a high-volume of No-Fault insurance patients, and who have conspired with Myrtle Avenue and Dekhkanov to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

5.      As discussed below, the Defendants have always known that the claims for the Fraudulent Equipment and/or Fraudulent Rental Equipment submitted to GEICO were fraudulent because:

(i)      The Fraudulent Equipment and Fraudulent Rental Equipment were provided, to the extent provided at all, based upon prescriptions received as a result of unlawful financial arrangements involving the Defendants and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(ii)     The prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were not medically necessary and were provided – to the extent provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iii)    The Fraudulent Equipment was provided – to the extent provided at all – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and

(iv)     To the extent any equipment was provided to Insureds, the bills for Fraudulent Rental Equipment submitted by the Defendants to GEICO and other New York automobile insurers, fraudulently misrepresented that the charges were permissible and grossly inflated the reimbursement rate that the Defendants could have received for the Fraudulent Rental Equipment.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment and/or Fraudulent Rental Equipment billed to GEICO through Myrtle Avenue.

7.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Myrtle Avenue's fraudulent scheme.

8.      The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began no later than July 2018, and the scheme has continued uninterrupted since that time.

9.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $430,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company, are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.     Defendants

11.     Defendant Myrtle Avenue is a New York limited liability company with its principal place of business in Glendale, New York.  Myrtle Avenue was formed on March 16, 2017, and its sole member is Dekhkanov.  Dekhkanov, with the assistance of the John Doe Defendants, has used Myrtle Avenue as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers, and continues to submit fraudulent billing through and including the present.

12.     Defendant Dekhkanov resides in and is a citizen of New York. Dekhkanov is not and has never been a licensed healthcare provider. Dekhkanov entered into agreements with the John Doe Defendants in order for Myrtle Avenue to obtain prescriptions for the Fraudulent Equipment and Fraudulent Rental Equipment purportedly issued by the Referring Providers.

13.     The John Doe Defendants are citizens of New York and include laypersons not presently identifiable who: (i) are associated with the Clinics and/or Surgery Centers; (ii) are not licensed healthcare professionals and illegally own and control the Clinics; and (iii) have conspired

with Myrtle Avenue and Dekhkanov to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

**ALLEGATIONS COMMON TO ALL CLAIMS**

17.     GEICO underwrites automobile insurance in the State of New York.

I.     **An Overview of the Pertinent Laws**

    A.     **Pertinent Laws Governing No-Fault Insurance Reimbursement**

18.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

19.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

21.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

22.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

23.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

24.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

25.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a

business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

26.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP").  See NYC Admin. Code §20-426.

27.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

28.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

29.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

30.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

31.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto . . ., commits a fraudulent insurance act, which is a crime.

32.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

33.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

34.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known

as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, cervical traction units, and devices to prevent deep vein thrombosis.

35.     A subcategory of DME includes Orthotic Devices ("OD"), which consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

36.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

37.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

38.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

39.     As indicated by the New York Fee Schedule, for dates of service prior to April 4, 2022, payment for DME and OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

40.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

41.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

42.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

43.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

44.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

45.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME qualify for reimbursement under a specific HCPCS Code.

46.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiating between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

47.     As it relates to charges for renting DME, the New York Fee Schedule set forth the maximum charges as follows:

> the maximum permissible monthly rental charge for such equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule.

See 12 N.Y.C.R.R. § 442.2(b) (2021).

48.     As indicated by the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

49.     Under the Medicaid Fee Schedule, the total monthly rental charges for equipment, supplies, and services, of Fee Schedule items is 10% of the maximum reimbursement amount.

50.     Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

51.     Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c) (2021). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

52.     For dates of service prior to April 4, 2022, when DME was rented and charged to automobile insurers using HCPCS codes that are recognized by the Medicaid Fee Schedule but do not contain a maximum reimbursement amount then the maximum charge for a monthly rental is 10% of the acquisition cost for the DME or OD, which includes all supplies that are provided with DME rental. See New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines, p. 16; Gov't Emples. Ins. Co. v. MII Supply LLC, Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty. December 4, 2019) (applying the 10% of acquisition cost rule for DME rentals, including all supplies, within the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines to No-Fault reimbursement for HCPCS Codes that are recognized by the Medicaid Fee Schedule but do not contain a reimbursement amount).

53.     For these charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public

because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

54.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

55.     Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of certain continuous passive motion devices. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

56.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

57.     However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

58.     Specifically, this emergency amendment capped the total rental of items with no reimbursement rate in the WC DME Fee Schedule at the lesser of: (1) the acquisition cost (i.e. the line-item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable

considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

59.     Thus, at all relevant times, the total charges submitted for renting Non-Fee Schedule items that do not have a reimbursement rate under the WC DME Fee Schedule cannot exceed the usual and customary price charged to the general public.

60.     For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

> (d)(1)  On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.
>
> (2)     The total accumulated rental charge for such durable medical equipment shall be the least of the:
>
> (i)      Acquisition cost plus 50%;
>
> (ii)     Usual and customary price charged by durable medical equipment providers to the general public; or
>
> (iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

61.     In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at 1/300th of the acquisition cost and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

62.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(ii)    The prescription for DME is not based any unlawful financial arrangement;

(iii)   The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(v)     The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

(vi)    The *pro rata* monthly rental fee sought for renting DME to an Insured was not in excess of the standard for calculating rental reimbursement.

## II.     **The Defendants' Fraudulent Schemes**

### A.     **Overview of the Defendants' Fraudulent Schemes**

63.     Beginning in 2018, Dekhkanov conceived and implemented complex fraudulent schemes in which he used Myrtle Avenue as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which the Defendants were never entitled to receive.

64.     Dekhkanov used Myrtle Avenue to directly obtain No-Fault benefits and maximize the amount of No-Fault Benefits he could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for Fraudulent Equipment and Fraudulent Rental Equipment.

65.     While Dekhkanov always used Myrtle Avenue to fraudulently submit bills to GEICO and other New York automobile insureds, over time, Dekhkanov changed the type of fraudulent billing submitted by Myrtle Avenue to GEICO and other automobile insurers, in order to exploit the methods of reimbursement permitted under the No-Fault Laws and maximize the amount of No-Fault Benefits he could obtain.

66.     For example, through 2019, the Defendants' fraudulent scheme mainly involved billing for multiple items of Fraudulent Equipment to Insureds, based upon prescriptions obtained from Clinics, purportedly issued by the Referring Providers, which commonly included "custom-fitted" equipment.

67.     In 2019, Myrtle Avenue's fraudulent scheme expanded to include a significant volume of renting Fraudulent Rental Equipment to Insureds in the form of SAM Units, which were also based upon prescriptions that were obtained from Clinics purportedly issued by the Referring Providers.

68.     Later on in 2019, Myrtle Avenue shifted the fraudulent scheme from billing for prescriptions that came from Clinics to billing for Fraudulent Rental Equipment that was based off of prescriptions issued to Insureds from Surgical Centers, after Insureds underwent minimally invasive arthroscopic surgeries. The Fraudulent Rental Equipment based on prescriptions from Surgical Centers mainly included CPMs and CCUs.

69.     The fraudulent scheme by Myrtle Avenue that was based upon prescriptions purportedly issued from Referring Providers at Surgery Centers after the performance of minimally invasive surgeries has continued to the present.

70.     Between July 2018 and the present, the Defendants submitted more than $3.5 million dollars in fraudulent claims to GEICO seeking reimbursement for Fraudulent Equipment

and Fraudulent Rental Equipment. To date, the Defendants have wrongfully obtained more than $430,000.00 from GEICO, and there is more than $1,500,00.00 in additional fraudulent claims that have yet to be adjudicated but for which the Defendants continue to seek payment from GEICO.

71.     The Defendants were able to perpetrate the fraudulent scheme against GEICO as described below by obtaining prescriptions for Fraudulent Equipment and Fraudulent Rental equipment purportedly issued by the Referring Providers because of improper agreements with third-party individuals, but who were associated with the Surgical Centers or Clinics.

72.     As part of this scheme and based on unlawful financial arrangements with these unidentifiable third parties, the Defendants obtained prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment that were purportedly issued by the Referring Providers.

73.     Myrtle Avenue did not market or advertise to the general public, lacked any genuine retail or office location, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

74.     Similarly, Dekhkanov did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

75.     Instead, the Defendants entered into illegal, collusive agreements with the John Doe Defendants, so that prescriptions purportedly issued by the Referring Providers would be steered to Myrtle Avenue for the specifically targeted Fraudulent Equipment and Fraudulent Rental Equipment.

76.     Defendants received the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment, purportedly issued by the Referring Providers as part of the unlawful financial

arrangements, directly from the Clinics and Surgical Centers, and without going through the Insureds. Many of these prescriptions were bogus and contained a duplicated signature of the Referring Provider who purportedly issued the prescription.

77.     Once the Defendants received these bogus prescriptions directly from a Clinic, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for Fraudulent Equipment that was purportedly provided to the Insureds.

78.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment and Fraudulent Rental Equipment, the Defendants indicated that they provided Insureds with Fraudulent Equipment and/or Fraudulent Rental Equipment that was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

79.     However, none of the charges identified in Exhibit "1" were for medically necessary Fraudulent Equipment and/or Fraudulent Rental Equipment. For example, the charges related to the rental of CPMs and CCUs for weeks at a time were routinely based upon prescriptions received after minimally invasive arthroscopic procedures when the post-operative care included physical therapy, obviating the need for at-home CPMs and CCUs.

80.     In addition, the Defendants also obtained generic and vague prescriptions for Fraudulent Equipment from Referring Providers, which did not identify specific DME or OD that was determined by a licensed healthcare provider to be medically necessary.

81.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment using specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME and/or OD.

82.     However, once the Defendants received these intentionally vague and generic prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule items with HCPCS Codes based upon Dekhkanov's determination of what he wanted to provide to Insureds, not based upon the determination of a medically necessary item by a licensed healthcare provider.

83.     In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants submitted bills for Fraudulent Rental Equipment that grossly inflated the permissible reimbursement rate in order to maximize the amount of No-Fault Benefits that they could receive.

84.     To further their scheme to defraud GEICO, and other automobile insurers, the Defendants submitted bills for rental items that falsely indicated they were seeking reimbursement at: (i) a monthly rental rate of 10% of the acquisition cost or maximum reimbursement amount of Fee Schedule items; or (ii) less than or equal to the monthly rental cost to the general public for the same Non-Fee Schedule item.

85.     In actuality, the bills the Defendants submitted to GEICO for renting Fraudulent Rental Equipment contained grossly inflated reimbursement rates that did not accurately represent: (i) the maximum permissible cost for renting Fee Schedule items; and (ii) the maximum permissible cost for renting Non-Fee Schedule items.

86.     After obtaining medically unnecessary prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment purportedly issued by the Referring Providers, the Defendants would bill GEICO for: (i) Fraudulent Equipment and Fraudulent Rental Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid

prescriptions from licensed healthcare providers; (iii) Fraudulent Rental Equipment at grossly inflated reimbursement rates; and (iv) Fraudulent Equipment and Fraudulent Rental Equipment that was otherwise not reimbursable.

**B.    The Defendants' Illegal Financial Arrangements**

87.    In order to obtain access to Insureds so the Defendants could implement and execute their fraudulent schemes and maximize the amounts of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into illegal agreements by and between themselves, where prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were provided to the Defendants in exchange for financial consideration.

88.    Since at least July 2018, Myrtle Avenue and Dekhkanov engaged in unlawful financial arrangements with the John Doe Defendants and others not presently identifiable in order to obtain prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment purportedly issued by the Referring Providers. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment and Fraudulent Rental Equipment to GEICO and other New York automobile insurers in New York.

89.    As part of the unlawful financial arrangements, the Defendants would pay thousands of dollars in kickbacks to the John Doe Defendants and others not presently identifiable, including by way of fictitious businesses, to obtain prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment purportedly issued by the Referring Providers.

90.    In keeping with the fact that the Defendants obtained prescriptions based upon unlawful financial arrangements, the Defendants submitted fraudulent invoices to GEICO from purported DME wholesalers who were not in operation at the time of the dated invoices.

91.     For example, the Defendants submitted invoices from a DME wholesaler named "Karama Supplies" for DME purportedly purchased by Myrtle Avenue in 2019. However, these invoices were false and fraudulent as Karama Supplies was dissolved by proclamation filed with the New York Secretary of State in 2016, years before Myrtle Avenue was even formed.

92.     In reality, the fraudulent invoices in the name of Karama Supplies were used – in part – to cover-up payments made by Myrtle Avenue to participate in the illegal kickback scheme.

93.     In further keeping with the fact that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were the result of unlawful financial arrangements by and between the Defendants and with others not presently identifiable, the prescriptions for Fraudulent Equipment were not medically necessary, were provided pursuant to predetermined protocols, and would not be provided by legitimate healthcare providers under identical circumstances.

94.     In further keeping with the fact that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were the result of unlawful financial arrangements by and between the Defendants and with others not presently identifiable, the Defendants received prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment directly from the Clinics, without any communication or involvement by the Insureds.

95.     In keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment as a result of unlawful financial arrangements, the Defendants: (i) obtained many prescriptions that contained a photocopied or stamped signature of Referring Providers; (ii) received similar predetermined sets of prescriptions from multiple Referring Providers; and (iii) received prescriptions that did not explain how to use the DME devices, making the prescriptions incomplete and, therefore, invalid.

96.     But for the payment of kickbacks from the Defendants, the unidentified individuals who were working with the Referring Providers would not have had any reason to: (i) direct the medically unnecessary prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment directly to Myrtle Avenue; (ii) make the Insureds' information available to Myrtle Avenue; and/or (iii) in multiple instances, provide Myrtle Avenue with forged, unauthorized, or illegally duplicated prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment.

97.     In all the claims identified in Exhibit "1," the Defendants falsely represented that Fraudulent Equipment and Fraudulent Rental Equipment were provided pursuant to lawful prescriptions from healthcare providers and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were provided pursuant to unlawful financial arrangements and, therefore, were never eligible for reimbursement.

**C.      The Fraudulent Prescription-Issuing Protocol for Fraudulent Equipment**

98.     In addition to the unlawful financial arrangements by the Defendants, the Defendants conspired with the John Doe Defendants and others not presently identifiable to obtain medically unnecessary prescriptions for the Fraudulent Equipment, which were designed to maximize the billing that the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

99.     The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols that were established by the Defendants and others not presently identifiable, not because the Fraudulent Equipment was medically necessary for each Insured based upon their individual symptoms or presentations, but solely for Defendants' own financial enrichment.

100.    In the claims identified in Exhibit "1," virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents -- to the extent they were involved in any actual accidents at all.

101.    Concomitantly, almost none of the Insureds identified in Exhibit "1" whom the Referring Providers purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

102.    In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

103.    To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

104.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent they were actually injured at all – virtually all of the Insureds who treated with a Referring Provider were subject to extremely similar treatment.

105.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols that were established by the Defendants and others not presently identifiable, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

106.     No legitimate physician, chiropractor, licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

107.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patients' individual symptoms or presentation.

108.     Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

109.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained-of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

110.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

111.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

112.     If a healthcare provider determines that DME and/or OD is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why it was medically necessary, such as how a specific item would benefit the patient.

113.     Here, based upon the predetermined fraudulent protocols by the Defendants and others not presently identifiable, the Defendants obtained similar prescriptions for Fraudulent Equipment from various Referring Providers that were the basis for many of the charges identified in Exhibit "1."

114.     Regardless which Referring Provider issued the Prescription and despite the fact that the Insureds were differently situated, the Defendants virtually always purported to provide the Insureds with the same type of Fraudulent Equipment, which was the basis for many of the claims identified in Exhibit "1".

115.     In keeping with the fact that the Fraudulent Equipment purportedly provided by the Defendants were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there were contemporaneously dated medical records, such as an initial examination report or a follow-up examination report, the reports virtually never fully identified the Fraudulent Equipment purportedly prescribed to the Insureds or explained why the healthcare provider prescribed any of the Fraudulent Equipment.

116.     To the extent that any of the medical records that did identify Fraudulent Equipment purportedly prescribed by the Referring Providers, the medical records never explained the medical necessity for the Fraudulent Equipment.

117.     For example:

(i)     On August 3, 2018, two Insureds named AW and ET were purportedly involved in the same motor vehicle accident.  On August 7, 2018, Atual Chowdhury, D.N. ("Chowdhury") purportedly conducted examinations of AW and ET.  Thereafter, Chowdhury issued prescriptions in the names of AW and ET that were provided to the Defendants for "LSO-Lumbar Support."  The Defendants billed GEICO $322.98 using HCPCS Code L0627 for purportedly providing an LSO to AW on August 15, 2018 and to ET on August 21, 2018;

(ii)    On December 11, 2018, two Insureds named TB and TH were purportedly involved in the same motor vehicle accident. On December 12, 2018, Farzad Haghighi, M.D. ("Haghighi"), purportedly conducted examinations of TB and TH.  Thereafter, Haghighi issued prescriptions in the names of TB and TH that were provided to the Defendants for a "Lumbar Support." The Defendants billed GEICO $322.98 using HCPCS Code L0627 for purportedly providing an LSO to TB and to TH on January 17, 2019;

(iii)   On December 12, 2018, an Insured named MM was purportedly involved in a motor vehicle accident. On January 24, 2019, Danilo Humberto Sotelo-Garza, M.D. ("Sotelo-Garza") purportedly conducted an examination of MM.  Thereafter, Sotelo-Garza issued a prescription in the name of MM that was provided to the Defendants for a "Lumbar Support." The Defendants billed GEICO $322.98 using HCPCS Code L0627 for purportedly providing an LSO to MM on February 11, 2019;

(iv)    On January 23, 2019, an Insured named HP was purportedly involved in a motor vehicle accident. On January 24, 2019, Sotelo-Garza purportedly conducted an examination of HP.   Thereafter, Sotelo-Garza issued a prescription in the name of HP that was provided to the Defendants for a "Lumbar Support." The Defendants billed GEICO $322.98 using HCPCS Code L0627 for purportedly providing an LSO to HP on February 11, 2019; and

(v)     On March 14, 2019, two Insureds named AS and CA were purportedly involved in the same motor vehicle accident. On March 19, 2019, Haghighi purportedly conducted examinations of AS and CA.  Thereafter, Haghighi issued prescriptions in the names of AS and CA that were provided to the Defendants for a "Lumbar Support." The Defendants billed GEICO $322.98 using HCPCS Code L0627 for purportedly providing an LSO to AS on April 3, 2019 and to CA on April 8, 2019.

These are only representative examples.

118.    In further keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants were not medically necessary and were provided – to the extent

provided at all – pursuant to predetermined fraudulent protocols, many of the prescriptions for the Fraudulent Equipment appeared to have been photocopied, with only the name of the patient changing from prescription to prescription.

119.   For example:



120.   Moreover, many of the prescriptions for the Fraudulent Equipment appeared to have photocopied signatures of the Referring Provider.

121.   For example:

122.    As part of the fraudulent scheme, the prescriptions purportedly issued by the Referring Providers – such as the ones shown above – were purposefully generic and vague, because the prescriptions did not definitively identify the DME and/or OD to be provided. For example, the vague and generic prescriptions did not: (i) provide a specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a specific type of DME and/or OD.

123.    The vague and generic prescriptions from the Referring Providers were intended to and actually afforded the Defendants with the opportunity to select from among several different pieces of Fraudulent Equipment, each having varying reimbursement rates in the Medicaid Fee Schedule.

124.     Myrtle Avenue is not a licensed medical professional corporation, and Dekhkanov is not a licensed healthcare provider. As such, Defendants were not lawfully permitted to prescribe DME and OD to Insureds. For the same reason, Defendants cannot properly dispense or rent DME and/or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies the DME and/or OD to be provided.

125.     By using the vague and generic prescriptions, such as those described above, Defendants improperly decided what DME and OD to provide to Insureds without a clear indication from a licensed healthcare provider regarding what was necessary, to the extent any DME or OD was provided to the Insureds at all.

126.     For example, the Referring Providers routinely issued vague prescriptions, including those requesting a "LSO brace", "Lumbar Support", or "LSO-Lumbar Support" which corresponds to over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount that can be dispensed to Insureds, including:

(i)      HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)     HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)    HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)     HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)      HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)     HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)    HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $ 806.64.

(viii)    HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $ 1150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)    HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)    HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xiii)    HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv)    HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1036.35.

(xv)    HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi)    HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii)    HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii)    HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix) HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx) HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii) HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

127. As unlicensed healthcare providers, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription, such as a prescription for a "LSO brace", "Lumbar Support", or "LSO-Lumbar Support".

128. In a legitimate clinical setting, a DME/OD retailer would contact the prescribing healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

129. However, virtually each and every time that the Defendants received a prescription from the Referring Providers for a "LSO brace", "Lumbar Support", or "LSO-Lumbar Support", the Defendants billed GEICO using either HCPCS Code L0637 or L0627 requesting reimbursement of $844.13 and $322.98, respectively, for each unit, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

130.    Even more, upon information and belief, the Defendants never contacted the Referring Providers, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for, and accordingly provide the Insureds with, based upon the vague and generic prescriptions for Fraudulent Equipment, to the extent that any Fraudulent Equipment was actually provided at all.

131.    The Fraudulent Equipment identified in Exhibit "1" provided – to the extent provided at all – by Defendants to the Insureds were not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types of DME and/or OD; or (ii) the medical necessity of the specific items dispensed in relation to the Insureds. Rather, the Fraudulent Equipment identified in Exhibit "1" were the result of decisions made by the Defendants.

132.    In all of the claims identified in Exhibit "1" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants own determination of what unique types of Fraudulent Equipment to dispense, and, thus, was not eligible for reimbursement of No-Fault Benefits.

133.    Additionally, as part of the fraudulent scheme, the prescriptions purportedly issued by Referring Providers were never given to the Insureds but were routed directly to the Defendants, thus taking any risk out of the equation that an Insured would fill the prescription from an outside source.

134.    For the reasons set forth above, in each of the claims for Fraudulent Equipment identified in Exhibit "1", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant to agreements between themselves and others not presently identifiable.

**D.     The Fraudulent Prescription-Issuing Protocol for Fraudulent Rental Equipment**

135.    In addition to the scheme with others to obtain medically unnecessary prescriptions for Fraudulent Equipment, the Defendants conspired to obtain medically unnecessary prescriptions for Fraudulent Rental Equipment, which were designed to maximize the billing the Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

136.    The prescriptions for Fraudulent Rental Equipment that were purportedly issued to the Insureds identified in Exhibit "1" pursuant to predetermined fraudulent protocols that were established by the Defendants, and not because the Fraudulent Rental Equipment was medically necessary for each Insured based upon their individual symptoms or presentations.

**(i)     Predetermined Prescription Protocol involving SAM Units**

137.    Upon information and belief, in the claims identified in Exhibit "1", substantially all of the Insureds to whom the Defendants purported to provide a SAM Unit were involved in relatively minor and low-impact "fender-bender" accidents, to the extent they were involved in any actual accidents at all.

138.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain from low-impact "fender-bender" accidents should begin with conservative therapies such as short-term bed

rest, mobilizing exercises, physical therapy, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

139.     If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment and the use of pain management medication.  These clinical approaches are well-established.

140.     In fact, the Insureds were virtually always directed to a course of supervised in-office conservative care, including physical therapy, chiropractic treatments, and pain medications, that was sufficient to treat the Insured's soft tissue injuries without a prescription and rental of a device not sufficiently proved to be effective.

141.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms or presentation and assess whether that course of treatment was working before prescribing a DME device, like a SAM Unit, that has not sufficiently been proven effective for treating the injuries sustained by the Insureds involved in automobile accidents.

142.     Commercial insurers do not provide reimbursement for SAM Units.  Aetna, for example, states that it considers "hands-free" ultrasound and low frequency sound devices experimental and investigational because their clinical values have not been established.

143.     In keeping with the fact that the prescriptions used by the Defendants were not medically necessary and were rather the result of predetermined fraudulent protocols, the SAM Units were often prescribed to Insureds within days of their accidents – and before the Referring Provider even had time to assess whether the supervised in-office conservative care that the Insured was undergoing had resolved the Insured's injuries.

144.    In further keeping with the fact that the prescriptions for SAM Units were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation or treatment report issued by the Referring Provider, the report virtually always failed to identify the prescription for a SAM Unit rental that was provided to the Defendants and ultimately used as the basis to bill GEICO for the SAM Unit rental charges identified in Exhibit "1."

145.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or issue new DME.

146.    However, follow-up examinations or treatment reports from the Referring Providers -- to the extent there were follow-up examinations -- failed to include any information regarding the SAM Unit that was previously prescribed to the Insureds.

147.    In further keeping with the fact that the prescriptions for SAM Units were issued as part of a predetermined fraudulent protocol, and issued without medical necessity, many Insureds were issued a prescription for a SAM Unit on a date that the Insureds were not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.  For example:

> (i)    On September 21, 2018, an Insured named RW was purportedly involved in a motor vehicle accident and thereafter began treating with Bret Jenkins, D.C. ("Jenkins"). On October 23, 2018, Jenkins purportedly issued a prescription in the name of RW that was provided to Myrtle Avenue for the rental of a SAM Unit for up to eight weeks, when Jenkins did not examine or otherwise treat RW on that day. Notably, there is no record regarding the issuance of this prescription in any treatment notes for RW;

  (ii)  On October 18, 2018, an Insured named NN was purportedly involved in a motor vehicle accident. On November 27, 2018, Arie Cohen, D.C. ("Cohen") purportedly issued a prescription in the name of NN that was provided to Myrtle Avenue for the four-to-six-week rental of a SAM Unit, despite Cohen never treating NN and NN not being examined or otherwise treated by any chiropractor on that day. <u>Notably, there is no record regarding the issuance of this prescription in any treatment notes for NN</u>;

  (iii)  On October 20, 2018, an Insured named UA was purportedly involved in a motor vehicle accident and thereafter began treating with Triboro Chiropractic P.C. On February 4, 2019, Cohen purportedly issued a prescription in the name of UA that was provided to Myrtle Avenue for the four-to-six-week rental of a SAM Unit, despite Cohen never treating UA. <u>Notably, there is no record regarding the issuance of this prescription in any treatment notes for UA</u>;

  (iv)  On December 23, 2018, an Insured named DM was purportedly involved in a motor vehicle accident and thereafter began treating with Jenkins. On January 18, 2019, Jenkins purportedly issued a prescription in the name of DM that was provided to Myrtle Avenue for the eight-week rental of a SAM Unit when Jenkins did not examine or otherwise treat DM on that day. <u>Notably, there is no record regarding the issuance of this prescription in any treatment notes for DM</u>; and

  (v)  On February 8, 2019, an Insured named TZ was purportedly involved in a motor vehicle accident and thereafter began treating with Jenkins. On February 28, 2019, Jenkins purportedly issued a prescription in the name of TZ that was provided to Myrtle Avenue for the eight-week rental of a SAM Unit when Jenkins did not examine or otherwise treat TZ on that day. <u>Notably, there is no record regarding the issuance of this prescription in any treatment notes for TZ</u>.

These are only representative samples.

  148. In fact, virtually all Insureds identified in Exhibit "1" that received prescriptions for a SAM Unit received prescriptions virtually identical to the ones identified above pursuant to predetermined fraudulent protocols established at the Clinics.

  149. In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

150.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

151.    It is extremely improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibit "1" – who treated with a Referring Provider at a Clinic – would ultimately receive the same prescriptions for SAM Units, despite being differently situated in the underlying accident.

152.    A substantial number of Insureds receiving virtually identical prescriptions for SAM Units would, by extension, mean that all those Insureds had nearly identical injury presentations.

153.    There is no specific HCPCS Code for a SAM Unit, and, in fact, Myrtle Avenue billed charges for the purported rental of these devices under a miscellaneous HCPCS code, E1399.

154.    For the reasons set forth above, all of the charges for SAM Units identified in Exhibit "1" were not medically necessary and were provided as part of predetermined fraudulent protocols.

### (ii)    Post-Operative CCU and CPM Prescriptions

155.    For the Insureds identified in Exhibit "1" that received Fraudulent Rental Equipment after arthroscopic surgeries, the Referring Providers issued prescriptions for Fraudulent Rental Equipment without regard for the Insureds individual ability for post-surgical recovery.

156.    In a legitimate setting, when a patient injured in a motor vehicle accident undergoes a minimally invasive surgery, such as the arthroscopic surgery performed on many of the Insureds referenced in Exhibit "1", the surgeon would evaluate the patient's individual circumstances to determine a specific course of post-surgical rehabilitation.

157.    Furthermore, in a legitimate setting, in determining a specific course of post-surgical rehabilitation, a surgeon may – but does not always – prescribe DME that should aid in the patient's surgical recovery.

158.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit the fraudulent protocols described below to proceed under his, her, or its auspices.

159.    In a legitimate setting, in determining whether to prescribe DME as part of a patient's surgical recovery, a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual presentation for post-surgical recovery.

160.    It is extremely improbable – to the point of an impossibility – that virtually all of the Insureds identified in Exhibit "1" who underwent minimally invasive surgical procedures – would ultimately receive the same post-surgical treatment, including prescriptions for CCUs and CPMs, despite being differently situated.

161.   A substantial number of Insureds receiving virtually identical post-operative prescriptions for CCUs and CPMs would, by extension, mean that all those Insureds had presentations for post-surgical recovery.

162.   However, pursuant to the predetermined fraudulent protocols implemented by the Defendants and others, the Insureds who underwent a surgical procedure were prescribed virtually identical post-surgical Fraudulent Rental Equipment without regard for the medical necessity of the Fraudulent Rental Equipment, the Insureds' individual post-surgical presentation, or ability for post-surgical recovery.

163.   In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated operative report issued by the Referring Provider, the report virtually always failed to identify the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibit "1."

164.   In a legitimate setting, when a patient returns for a post-operative follow-up examination, the surgeon would inquire – and appropriately report – whether the previously prescribed DME aided the patient's recovery. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME, issue new DME, or discontinue the use of DME altogether.

165.   However, follow-up examination reports issued by the Referring Providers, to the extent there were follow-up examinations, failed to include any information regarding the Fraudulent Rental Equipment that was previously prescribed to the Insureds.

166.     Pursuant to the predetermined fraudulent protocols implemented by the Defendants and others associated with the Clinics, Insureds were prescribed similar Fraudulent Rental Equipment without regard for the medical necessity of the Fraudulent Rental Equipment, the Insureds' individual post-surgical presentation and ability for post-surgical recovery.

167.     For example:

(i)      On March 27, 2021, an Insured named KM was purportedly involved in a motor vehicle accident. On September 15, 2021, Ronald Daly, M.D. ("Daly") performed an arthroscopic procedure on KM's right shoulder at Surgicare of Brooklyn in Brooklyn, New York. On September 16, 2021, one day after the arthroscopic surgery, on a day that Daly did not treat KM, Daly purportedly issued a prescription in the name of KM for a 42-day rental of a CPM and a 42-day rental of a CCU that were provided to the Defendants.  Notably, there is no record regarding the issuance of these prescriptions in any of Daly's treatment notes for KM;

(ii)     On May 7, 2021, an Insured named GG, was purportedly involved in a motor vehicle accident. On October 1, 2021, Anjani Sinha, M.D. ("Sinha") performed an arthroscopic procedure on GG's right shoulder at Citimed Surgical Center in Queens, New York ("Citimed SC"). On October 1, 2021, the day of the surgery, Sinha purportedly issued DME in the name of GG to two different DME suppliers. One week later, on October 8, 2021, a day that Sinha did not treat GG, Sinha purportedly issued a prescription in the name of GG for the two-to-four-week rental of a CPM that was provided to the Defendants;

(iii)    On August 23, 2021, an Insured named SC was purportedly involved in a motor vehicle accident. On April 9, 2022, Jeffrey Guttman, M.D. ("Guttman") performed an arthroscopic procedure on SC's right shoulder at Integrated Specialty ASC in Saddle Brook, New Jersey. On the same date as the arthroscopic surgery, Guttman purportedly issued a prescription in the name of SC for the four-six-week rental of a CPM that was provided to the Defendants. Notably, there is no record regarding the issuance of this prescription in any of Guttman's treatment notes for SC;

(iv)     On October 30, 2021, an Insured named AA was purportedly involved in a motor vehicle accident. On June 27, 2022, Laxmidhar Diwan, M.D. ("Diwan") performed an arthroscopic procedure on AA's left knee at Rockaways Ambulatory Surgery Center in Rockaway Park, New York. On the same date as the arthroscopic surgery, Diwan purportedly issued a prescription in the name of AA for the 21-day rental of a CPM that was provided to the Defendants.  Notably, there is no record regarding the issuance of this prescription in any of Diwans's treatment notes for AA;

(v)      On November 3, 2021, an Insured named FS, was purportedly involved in a motor vehicle accident. On May 17, 2022, Graziosa performed an arthroscopic procedure on FS's left shoulder at ASC of Rockaway Beach, in Rockaway Park, New York ("ASC of Rockaway"). On May 13, 2022, four days prior to the arthroscopic surgery, Graziosa purportedly issued a prescription in the name of FS for a five-to-six-week rental of a CPM that was provided to the Defendants.  Notably, there is no record regarding the issuance of this prescription in any of Graziosa's treatment notes for FS;

(vi)     On November 8, 2021, an Insured named GH, was purportedly involved in a motor vehicle accident. On September 9, 2022, Albert Graziosa, M.D. ("Graziosa") performed an arthroscopic procedure on GH's right shoulder at The Ambulatory Surgery Center of East Tremont Medical Center in Bronx, New York. On the same date as the arthroscopic surgery, Graziosa purportedly issued a prescription in the name of GH for a five-to-six-week rental of a CPM and a 21-day rental of CCU that were provided to the Defendants.  Notably, there is no record regarding the issuance of these prescription in any of Graziosa's treatment notes for GH;

(vii)    On June 1, 2022, an Insured named MJJO was purportedly involved in a motor vehicle accident. On July 28, 2022, Sinha performed an arthroscopic procedure on MJJO's right shoulder at Citimed SC. On the same day as the arthroscopic surgery, Sinha purportedly issued a prescription in the name of MJJO for the two-to-four-week rental of a CPM and a two-to-four-week rental of a CCU that was provided to the Defendants;

(viii)   On November 4, 2022, an Insured named SB, was purportedly involved in a motor vehicle accident. On January 27, 2023, Michael Russonella, D.O. ("Russonella") performed an arthroscopic procedure on SB's right wrist at ASC of Rockaway. On the same day as the arthroscopic surgery, Russonella purportedly issued prescriptions in the name of SB for a four-week rental of a CPM and a 21-day rental of a CCU that were provided to the Defendants. Notably, there is no record regarding the issuance of these prescription in any of Graziosa's treatment notes for SB;

(ix)     On November 11, 2022, an Insured named EL was purportedly involved in a motor vehicle accident. On February 9, 2023, Paul Ackerman, M.D. ("Ackerman") performed an arthroscopic procedure on EL's right shoulder at AllCity Family Healthcare Center in Brooklyn, New York. On the same date as the arthroscopic surgery, Ackerman purportedly issued a prescription in the name of EL for the four-week rental of a CPM that was provided to the Defendants.  Notably, there is no record regarding the issuance of this prescription in any of Ackerman's treatment notes for EL; and

(x)      On January 4, 2023, an Insured named NW, was purportedly involved in a motor vehicle accident. On May 2, 2023, Graziosa performed an

arthroscopic procedure on NW's left knee at Corona Parkway ASC, in Bronx, New York. On the same date as the arthroscopic surgery, Graziosa purportedly issued a prescription in the name of NW for a five-to-six-week rental of a CPM that was provided to the Defendants.  <u>Notably, there is no record regarding the issuance of this prescription in any of Graziosa's treatment notes for NW</u>.

These are only representative samples.

168.    In fact, all of the Insureds identified in Exhibit "1" that received prescriptions for Fraudulent Rental Equipment after a surgical procedure received prescriptions for Fraudulent Rental Equipment virtually identical to the ones identified above pursuant to the predetermined fraudulent protocols.

169.    In keeping with the fact that the prescriptions for Fraudulent Rental Equipment identified in Exhibit "1" were part of predetermined fraudulent protocol – and not based upon medical necessity – the Defendants were regularly provided with prescriptions that contained a Referring Provider's signature that was photocopied or used a signature stamp of a Referring Provider's signature stamped on the prescription.

170.    For example, all prescriptions used to support the charges identified in Exhibit "1," that were purportedly issued by Anjani Sinha, were duplicated forms containing Sinha's photocopies signature, and with only the names of the Insureds changing from prescription to prescription:

## PRESCRIPTION/ LETTER OF MEDICAL NECESSITY

**PATIENT INFO:**

04/07/2022

**PATIENT NAME**                                    **SURGERY DATE**

Rotator cuff tear, impingement, bursitis, tendinitis.

**DIAGNOSIS CODES**

**EQUIPMENT PRESCRIBED:**

### COLD THERAPY CIRCULATING PUMP/GR

PART OF THE BODY:

☐ KNEE ☐ RIGHT ☐ LEFT     ANKLE ☐       ☐ RIGHT ☐ LEFT
☒ SHOULDER ☐ RIGHT ☒ LEFT   WRIST ☐      ☐ RIGHT ☐ LEFT
☐ OTHER

2-4 Weeks

**DURATION**

**SPECIAL INSTRUCTIONS**

**MEDICAL NECESSITY REASONING:**

I am prescribing Cold Therapy Circulating Pump/GR, as this device is medically necessary and reasonable in reference to my patient's post-operative recovery. This pneumatic cold compression therapy system will provide my patient adjustable cold and intermittent compression. Insofar as it is a proven and effective technique in post-operative recovery. Respectively,the Cold Therapy Unit will productively reduce recovery time as well as reducing swelling,edema and pain. By delivering comprehensive, flexible, and proven treatment of swelling, edema, pain or/and other post-surgical or injury conditions, I consider that my patient's rehabilitation process will be highly alleviated.

Physician Signature:

Physician Name:    Dr. Anjani Sinha
NPI Number:        1932233715
License Number:
Address:           164-10 Northern Blvd., Ste 204, Flushing NY 11358
TEL:               718-886-2011

---

## PRESCRIPTION/ LETTER OF MEDICAL NECESSITY

**PATIENT INFO:**

05/14/2022

**PATIENT NAME**                                    **SURGERY DATE**

Rotator cuff tear, lateral tear, impingement, bursitis, tendinitis.

**DIAGNOSIS CODES**

**EQUIPMENT PRESCRIBED:**

### COLD THERAPY CIRCULATING PUMP/GR

PART OF THE BODY:

☐ KNEE ☐ RIGHT ☐ LEFT     ANKLE ☐       ☐ RIGHT ☐ LEFT
☒ SHOULDER ☐ RIGHT ☐ LEFT   WRIST ☐      ☐ RIGHT ☐ LEFT
☐ OTHER

2-4 Weeks

**DURATION**

**SPECIAL INSTRUCTIONS**

**MEDICAL NECESSITY REASONING:**

I am prescribing Cold Therapy Circulating Pump/GR, as this device is medically necessary and reasonable in reference to my patient's post-operative recovery. This pneumatic cold compression therapy system will provide my patient adjustable cold and intermittent compression. Insofar as it is a proven and effective technique in post-operative recovery. Respectively,the Cold Therapy Unit will productively reduce recovery time as well as reducing swelling,edema and pain. By delivering comprehensive, flexible, and proven treatment of swelling, edema, pain or/and other post-surgical or injury conditions, I consider that my patient's rehabilitation process will be highly alleviated.

Physician Signature:

Physician Name:    Dr. Anjani Sinha
NPI Number:        1932233715
License Number:
Address:           164-10 Northern Blvd., Ste 204, Flushing NY 11358
TEL:               718-886-2011

---

## PRESCRIPTION/ LETTER OF MEDICAL NECESSITY

**PATIENT INFO:**

03/23/2022

**PATIENT NAME**                                    **SURGERY DATE**

Partial rotator cuff tear, impingement, bursitis, tendinitis.

**DIAGNOSIS CODES**

**EQUIPMENT PRESCRIBED:**

### CONTINUOUS PASSIVE MOTION DEVICE (CPM)

PART OF THE BODY:

☐ KNEE ☐ RIGHT ☐ LEFT     ☐ ANKLE      ☐ RIGHT ☐ LEFT
☒ SHOULDER ☐ RIGHT ☒ LEFT   ☐ WRIST      ☐ RIGHT ☐ LEFT
☐ OTHER

2-4 Weeks

**DURATION**

**SPECIAL INSTRUCTIONS**

**MEDICAL NECESSITY REASONING:**

I am prescribing CPM (Continuous Passive Motion) that will help my patient during the post-operative recovery by increasing range of motion, preventing the development of motion-limiting adhesions, decreasing soft tissue stiffness and stimulating healing of joint surfaces and soft tissues. Moreover, the prescribed CPM Device will involve movement of the joints without active contraction of muscle groups and without patient effort, In view of the fact that, active movement that might destabilize the recovery and, also cause a painful process. Inasmuch, using CPM Device, my patient will experience less pain, recover faster, and, consequently there will be less pain medication and physical therapy required.

Physician Signature:

Physician Name:    Dr. Anjani Sinha
NPI Number:        1932233715
License Number:
Address:           164-10 Northern Blvd., Ste 204, Flushing NY 11358
TEL:               718-886-2011

---

## PRESCRIPTION/ LETTER OF MEDICAL NECESSITY

**PATIENT INFO:**

07/14/2022

**PATIENT NAME**                                    **SURGERY DATE**

Rotator cuff tear, impingement, bursitis, tendinitis.      M75.l02    S43.92Z7

**DIAGNOSIS CODES**

**EQUIPMENT PRESCRIBED:**

### CONTINUOUS PASSIVE MOTION DEVICE (CPM)

PART OF THE BODY:

☐ KNEE ☐ RIGHT ☐ LEFT     ☐ ANKLE      ☐ RIGHT ☐ LEFT
☒ SHOULDER ☐ RIGHT ☒ LEFT   ☐ WRIST      ☐ RIGHT ☐ LEFT
☐ OTHER

2-4 Weeks

**DURATION**

**SPECIAL INSTRUCTIONS**

**MEDICAL NECESSITY REASONING:**

I am prescribing CPM (Continuous Passive Motion) that will help my patient during the post-operative recovery by increasing range of motion, preventing the development of motion-limiting adhesions, decreasing soft tissue stiffness and stimulating healing of joint surfaces and soft tissues. Moreover, the prescribed CPM Device will involve movement of the joints without active contraction of muscle groups and without patient effort, in view of the fact that, active movement that might destabilize the recovery and, also cause a painful process. Inasmuch, using CPM Device, my patient will experience less pain, recover faster, and, consequently there will be less pain medication and physical therapy required.

Physician Signature:

Physician Name:    Dr. Anjani Sinha
NPI Number:        1932233715
License Number:
Address:           164-10 Northern Blvd., Ste 204, Flushing NY 11358
TEL:               718-886-2011

171.    The Defendants knew that these prescriptions from the Referring Providers were based upon photocopies yet used these prescriptions as the basis to support the fraudulent charges identified in Exhibit "1" anyway, solely for their own financial enrichment.

172.    In further keeping with the fact that the prescriptions for Fraudulent Rental Equipment identified in Exhibit "1" were part of predetermined fraudulent protocols, the prescribed Fraudulent Equipment was not medically necessary.

173.    In a legitimate setting, there are only a limited number of circumstances where CPMs are medically necessary to aid in a patient's recovery. A CPM is a machine that provides joint movement without active contraction of muscle groups, with the goal of increasing range of motion and promotion healing of joint surfaces. Circumstances where CPMs could be medically necessary include patient recovery after a total replacement of a patient's knee or shoulder, or surgery to repair an anterior cruciate ligament.

174.    Moreover, and again in a legitimate setting, CPMs are not provided when patients undergo minimally invasive surgical procedures such as an arthroscopic surgery and when the patients can undergo traditional physical therapy. This is due to: (i) the ability for physical therapy to provide long-term benefits when CPMs cannot; and (ii) regularly accepted medical studies that have concluded that the use of CPMs in post-operative recovery do not provide any short-term or long-term benefit.

175.    In support of the fact that the CPMs are not medically necessary after arthroscopic surgeries, an evidence-based study on rehabilitation after arthroscopic rotator cuff repair revealed that there is no significant difference in the outcome of patients who used CPMs for three to four weeks after surgery compared to those who did not use CPMs for the same period.

176.    In further support of the limited uses of CPMs, the Centers for Medicare and Medicaid Services issued a National Coverage Determination concluding that CPMs are only considered necessary after: (i) total knee arthroplasty; (ii) anterior cruciate ligament repair/reconstruction; (iii) during the non-weight-bearing period to promote healing after cartilage grafting procedures; and (iv) surgical release of arthrofibrosis of any joint.

177.    Consistent with limited uses of CPMs by the Centers for Medicare and Medicaid, the American Academy of Orthopedic Surgeons ("AAOS") issued clinical practice guidance that the use of CPMs in *total knee replacement surgery* does not improve outcomes. Even more, AAOS clinical practice guidelines for rotator cuff and anterior cruciate ligament repairs do *not even address* the use of CPMs as part of the rehabilitative process.

178.    Unlike the Insureds identified in Exhibit "1" who were issued prescriptions for CPMs after an arthroscopic procedure, patients who undergo serious knee or shoulder surgery may have some short-term benefits by using CPMs to aid in quicker range of motion recovery.

179.    To the extent that CPMs are medically appropriate, in a legitimate setting, CPMs will be prescribed for only a short-term period that is typically less than two weeks. Long term usage of CPMs – such as for up to six weeks – will not legitimately be prescribed as there is no evidence that the long-term use of CPMs provide any benefit to patients.

180.    Additionally, in a legitimate setting, a patient would need a specific medical co-morbidity necessitating the need for a CPM, and the co-morbidity would be documented pre-operatively to indicate the necessity of a CPM.

181.    It is improbable that a legitimate healthcare provider would issue a prescription for a CPM to a patient post-arthroscopic surgery – let alone for up to six weeks of use – when that

patient is ambulatory, is able to undergo traditional physical therapy, and does not have a notated co-morbidity necessitating the need for a CPM.

182.    In keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" after surgery were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, the Insureds identified in Exhibit "1" were typically issued CPMs by the Defendants for between four and six weeks at a time after arthroscopic surgeries when the Insureds were able to and did undergo a physical therapy program that was contemporaneously prescribed.

183.    Furthermore, and in keeping with the fact that the CPMs prescribed to the Insureds identified in Exhibit "1" were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records, failed to identify and never explained the medical necessity of the prescriptions for CPMs that were used by the Defendants to submit charges to GEICO.

184.    For a legitimate and valid prescription, every prescription must have, among other things, an explanation for how the patient is supposed to use the prescribed DME. Here, the prescriptions submitted by Myrtle Avenue failed to explain how the Insured is supposed to use the CCU or CPM device, making the prescription incomplete and, therefore, invalid.

185.    Even if the CPMs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the four-to-six-week rental periods for the CPMs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines, including the AAOS, which does not recommend them in the context prescribed to the Insureds identified in Exhibit "1".

186.    Similarly, the CCUs that were prescribed and issued to the Insureds identified in Exhibit "1" were not medically necessary and were provided pursuant to a predetermined fraudulent protocol because they did not provide any additional medical benefit to Insureds.

187.    When a patient suffers from sprains and strains as part of a minor automobile accident, the patient's sprains and strains will virtually always resolve after a short course of conservative treatment such as rest, ice, compression, and elevation, which includes using ice-packs and placing an elastic bandage to provide compression.

188.    Where a patient is in a position to be able to place an ice-pack, there is little medically necessary reason to use a CCU. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CCU compared to an ice pack.

189.    There is little evidence to support the use of cryotherapy – either in the form of an ice pack or a CCU – for post-operative patients to decrease swelling, including patients who undergo minimally invasive procedures such as arthroscopic surgery, beyond the initial 72 hours post-surgery.

190.    After the first 72 hours, cryotherapy benefits post-arthroscopic surgery patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cryotherapy is typically provided by the physical therapist in the form of ice packs.

191.    It is improbable that a legitimate physician would issue a prescription for a CCU to a patient post-arthroscopic surgery when that patient is able to use ice-packs and is undergoing out-patient physical therapy.

192.    In keeping with the fact that the CCUs prescribed to the Insureds identified in Exhibit "1" were not medically necessary, and were provided pursuant to predetermined fraudulent

protocols, the Insureds identified in Exhibit "1" were virtually always prescribed the CCUs for weeks at a time when there was no objective evidence that suggested the Insureds were unable to use an ice pack.

193.    Furthermore, and in keeping with the fact that the CCUs prescribed to the Insureds identified in Exhibit "1" after surgery were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, the contemporaneously dated medical records, such as the surgical records, failed to identify and never explained the medical necessity of the prescriptions for CCUs that were used by the Defendants to submit charges to GEICO.

194.    Even if the CCUs that were prescribed to the Insureds identified in Exhibit "1" were medically appropriate, the length of use for the CCUs prescribed to the Insureds by the Referring Providers exceeded medical utility and did not comport with generally accepted medical guidelines.

195.    In keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the Fraudulent Rental Equipment purportedly issued by the Referring Providers did not provide any medical benefit to Insureds, as the Insureds could completely recover full range of motion with limited therapy after their minimally invasive procedures.

196.    In reality, for the reasons set forth above, all of the charges for Fraudulent Rental Equipment identified in Exhibit "1" were not medically necessary and were provided as part of predetermined fraudulent protocols. As such, the Defendants were never eligible for reimbursement of No-Fault Benefits.

**E.     The Defendants' Fraudulent Billing for Fraudulent Rental Equipment**

197.     In addition to the fraudulent schemes to submit bills for prescriptions that were based upon unlawful financial arrangements, prescriptions that were never actually issued by the Referring Provider indicated on the prescription and illegally duplicated, and medically unnecessary prescriptions that were based upon predetermined fraudulent protocols, the bills submitted to GEICO by the Defendants misrepresented, to the extent that any Fraudulent Rental Equipment was actually provided, that the charges for Fraudulent Rental Equipment were for permissible reimbursement rates, when they were not..

198.     As stated above, the New York Fee Schedule sets forth a maximum permissible rental charge, on a monthly basis, for renting equipment, supplies and services. For Fee Schedule items, the total monthly rental charges for equipment, supplies, and services, is no greater than 10% of the listed maximum reimbursement amount or 10% of the DME supplier's actual acquisition cost. For Non-Fee Schedule items, which includes the Fraudulent Equipment, the total monthly rental charges for equipment, supplies, and services is no greater than the average monthly cost to the general public.

199.     When the Defendants submitted bills to GEICO seeking payment for the Fraudulent Rental Equipment, each of the charges identified HCPCS codes that were used to describe the items purportedly rented or provided to the Insureds.

200.     When the Defendants submitted bills to GEICO seeking payment for renting Non-Fee Schedule items, which included SAM Units and CCUs billed under HCPCS Code E1399 and CPMs billed under HCPCS Codes E0935 and E0936, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible amount.

201.    For example, and as set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E1399 for purportedly renting SAM Units to Insureds – to the extent that the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect $17.00 per day for each SAM Unit rented to an Insured.

202.    However, each of the charges submitted by the Defendants for SAM Units under HCPCS Code E1399 fraudulently misrepresented the maximum reimbursement amount for the rental of these SAM Units, as the maximum reimbursement rate was only a fraction of what was charged to GEICO.

203.    When submitting billing under HCPCS Code E1399, the Defendants were required to submit documentation supporting their charges to GEICO, such as an invoice that details the unit cost of the SAM Device, to verify the rate charged to GEICO and other automobile insurers.

204.    However, the Defendants never submitted any documentation to substantiate their charges billed under HCPCS Code E1399.

205.    Upon information and belief, the Defendants never submitted any documentation to substantiate their charges for SAM Units billed under HCPCS Code E1399, because there was no documentation that could support the daily rental rates charged by the Defendants for SAM Unit rentals billed under HCPCS Code E1399.

206.    Whatever documentation the Defendants possessed regarding their purchase of SAM Units would indicate they were entitled to a daily rental rate substantially less than the $17.00 per day charged to GEICO.

207.    For example, GEICO is aware of other DME providers who purchased SAM Units at a per-unit cost of $2,325.00, which equates to a maximum monthly rental charge of $232.50, or

a maximum daily rental charge of $7.75, in contrast to the Defendants' charges to GEICO of $17.00 per day.

208.   In virtually all of the charges submitted to GEICO for rental of SAM Units using HCPCS Code E1399, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $17.00 per day, when their maximum reimbursement was substantially less.

209.   As an additional example, and as set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E1399 for purportedly renting CCUs to Insureds – to the extent that the DME was actually provided to Insureds – the Defendants fraudulently misrepresented that they were able to collect $88.00 per day for each CCU rented to an Insured.

210.   However, each of the charges submitted by the Defendants for CCUs under HCPCS Code E1399 fraudulently misrepresented the maximum reimbursement amount for the rental of these CCUs, as the maximum reimbursement rate was only a fraction of what was charged to GEICO.

211.   When submitting billing under HCPCS Code E1399, the Defendants were required to submit documentation supporting their charges to GEICO, such as an invoice that details the unit cost of the CCUs, to verify the rate charged to GEICO and other automobile insurers.

212.   Myrtle Avenue provided invoices from Karmara Supplies – a company that closed before Myrtle Avenue was even founded – that purports to claim Myrtle Avenue purchased "Game Ready" CCUs for $1,800.00 per unit.

213.   Even if the invoices from Karama Supplies accurately represented that Myrtle Avenue purchased a "Game Ready" CCU at $1,800.00 per unit, the maximum daily rental charge

would be $6.00 per day, which is a small fraction of the $88.00 per day the Defendants charged GEICO.

214.    In the charges submitted to GEICO for the rental of CCUs under HCPCS Code E1399, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $88.00 per day, when their maximum reimbursement was substantially less.

215.    Similarly, the Defendants' charges to GEICO for purportedly renting CPMs to Insureds using HCPCS Codes E0935 and E0936 – to the extent that the DME was actually provided to Insureds – also fraudulently misrepresented that the charges were no greater than the maximum permissible amount.

216.    As identified in Exhibit "1", when the Defendants submitted bills to GEICO for the rental of shoulder CPMs under HCPCS Code E0936, the rentals were most commonly charged to GEICO at a rate of $108.00 per day.

217.    Similarly, and as identified in Exhibit "1", when the Defendants submitted bills to GEICO for the rental of knee CPMs under HCPCS Code E0935, the rentals were most commonly charged to GEICO at a rate of $85.00 per day.

218.    However, each of the charges submitted by the Defendants for CPMs, under HCPCS Codes E0935 and E0936, fraudulently misrepresented the maximum reimbursement amount for the rental of CPMs, as the cost to the public for the same type of device was only a fraction of what was charged to GEICO.

219.    During GEICO's investigation into the Defendants, GEICO was able to determine prices for knee and shoulder CPMs that are available for rent to the general public at a fraction of the price the Defendants charged GEICO.

220.     Although the Defendants charged GEICO $85.00 per day for each knee CPM rented to Insureds, virtually identical knee CPMs were available for rent by the general public at drastically lower rates, such as through Greenvale Homecare for $600.00 for a four-week rental, which is the equivalent of $20.00 per day, or via online retailers such as through medcomgroup.com for between $625.00 and $750.00 depending upon the brand, for a four-week rental, which is the equivalent of between $20.83 and $25.00 per day.

221.     In virtually all of the charges submitted to GEICO for the rental of knee CPMs using HCPCS Code E0935, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $108.00 per day when the maximum reimbursement was no greater than the price available to the general public, which is no greater than $31.00 per day.

222.     Similarly, although the Defendants charged GEICO $108.00 per day for each shoulder CPM rented to Insureds, virtually identical shoulder CPMs were available for rent by the general public at drastically lower rates via online retailers, such as though medcomgroup.com for $1,025.00 for four weeks, which is the equivalent of $36.61 per day.

223.     In virtually all of the charges submitted to GEICO for the rental of shoulder CPMs using HCPCS Code E0936, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $108.00 per day, when the maximum reimbursement was no greater than the price available to the general public, which is no greater than $36.61 per day.

224.     In keeping with the fact that the maximum reimbursement for the knee and shoulder CPMs were substantially less than the price the Defendants submitted to GEICO, in April 2022 when the WC DME Fee Schedule came in to effect, it included weekly reimbursement rates for knee and shoulder CPMs that are the equivalent of $18.88 per day for a knee CPM and $31.19 per day for a shoulder CPM.

225.   In an effort to further their scheme, upon information and belief, the Defendants purposefully avoided researching the cost to the general public of the Fraudulent Equipment purportedly provided to the Insureds.

226.   Upon information and belief, the Defendants purposefully avoided researching the cost to the general public of Fraudulent Rental Equipment they purportedly provided, because they knew the items they rented were rented to the general public, by legitimate retailers, at significantly less than the amounts they charged and submitted to GEICO and other automobile insurers.

227.   Accordingly, in each of the claims identified within Exhibit "1", the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges for the Fraudulent Rental Equipment were less than or equal to the maximum reimbursement amount for each item. Instead, the Defendants purposefully billed GEICO at rates above the maximum reimbursement amounts in order to maximize the amount of No-Fault Benefits they could obtain from GEICO, and, thus, were not eligible for reimbursement of No-Fault Benefits.

**III.      The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

228.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the name of Myrtle Avenue, seeking payment for Fraudulent Equipment.

229.   The NF-3 forms or HCFA-1500 forms that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)      The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that Defendants provided the Fraudulent Equipment and Fraudulent Rental Equipment pursuant to prescriptions issued by licensed healthcare providers for reasonable and medically necessary medical equipment, and, therefore, were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Myrtle Avenue provided any of the Fraudulent Equipment or Fraudulent Rental Equipment at all, it was based

upon: (a) unlawful financial arrangements with healthcare providers, including the Referring Providers, either directly or through the John Doe Defendants or other third-parties who are presently unknown; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items; and

(ii)     The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO the proper reimbursement amount for Fraudulent Rental Equipment provided to the Insureds, to the extent that Myrtle Avenue provided any Fraudulent Equipment at all, and, therefore, were eligible to receive No-Fault Benefits. In fact, Defendants <u>were not</u> entitled to receive No-Fault Benefits because – to the extent any Fraudulent Rental Equipment was provided at all – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for the Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and prescriptions.

## IV.     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

230.     Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

231.     To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment and Fraudulent Rental Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

232.     Specifically, they knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were not based upon medical necessity but rather were: (i) based upon predetermined fraudulent protocols as a result of unlawful financial arrangements; (ii) were provided directly to Myrtle Avenue without the involvement of Insureds; and (iii) ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment and Fraudulent Rental Equipment was billed to GEICO for financial gain.

233.     Additionally, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment and Fraudulent Rental Equipment were billed to GEICO for financial gain.

234.     Furthermore, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME, and not by an actual healthcare provider's prescription for medically necessary DME, in order to prevent GEICO from discovering that Fraudulent Equipment and Fraudulent Rental Equipment was billed to GEICO for financial gain.

235.     Lastly, Defendants knowingly misrepresented the permissible reimbursement amount of the Fraudulent Rental Equipment contained in the bills submitted by Myrtle Avenue to GEICO in order to prevent GEICO from discovering that Fraudulent Rental Equipment was billed to GEICO for financial gain.

236.     GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

237.     In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through the Defendants (yet

GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

238.    Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

239.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $430,000.00 based upon the fraudulent charges.

240.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Myrtle Avenue**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

241.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in the paragraphs set forth above.

242.    There is an actual case in controversy between GEICO and Myrtle Avenue regarding more than $1.5 million in fraudulent billing that has been submitted to GEICO in the name of Myrtle Avenue.

243.    Myrtle Avenue has no right to receive payment for any pending bills submitted to GEICO, because the bills submitted to GEICO for Fraudulent Equipment and Fraudulent Rental

Equipment were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

244.    Myrtle Avenue also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants rather than to treat the Insureds.

245.    Myrtle Avenue has no right to receive payment for any pending bills submitted to GEICO, because Myrtle Avenue purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

246.    Myrtle Avenue has no right to receive payment for any pending bills submitted to GEICO because – to the extent that Myrtle Avenue provided any Fraudulent Rental Equipment at all – Myrtle Avenue fraudulently misrepresented that the charges for Fraudulent Rental Equipment contained within the bills were less than the maximum permissible reimbursement amount.

247.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Myrtle Avenue has no right to receive payment for any pending bills submitted to GEICO under the name of Myrtle Avenue.

## SECOND CAUSE OF ACTION
### Against Dekhkanov
### (Violation of RICO, 18 U.S.C. § 1962(c))

248.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in the paragraphs set forth above.

249.    Myrtle Avenue is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

250.     Dekhkanov knowingly conducted and/or participated, directly or indirectly, in the conduct of Myrtle Avenue's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Myrtle Avenue was not eligible to receive under the New York No-Fault Laws because: (i) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment and Fraudulent Rental Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment and Fraudulent Rental Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols, not upon medical necessity, solely to financially enrich the Defendants and others not presently known; (iii) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and (iv) to the extent that Myrtle Avenue actually provided Fraudulent Rental Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Rental Equipment. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

251.     Myrtle Avenue's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Dekhkanov operates Myrtle Avenue, insofar as Myrtle Avenue is not

engaged as a legitimate supplier of DME and/or OD and, therefore, acts of mail fraud are essential in order for Myrtle Avenue to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Dekhkanov continues to submit and attempt collection on the fraudulent billing submitted by Myrtle Avenue to the present day.

252.    Myrtle Avenue is engaged in inherently unlawful acts, because it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Myrtle Avenue in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

253.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills submitted through Myrtle Avenue.

254.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dekhkanov and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

255.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in the paragraphs set forth above.

256.    Myrtle Avenue is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

257.    Dekhkanov and the John Doe Defendants are owners of, employed by, or associated with the Myrtle Avenue enterprise.

258.     Dekhkanov and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Myrtle Avenue's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for more than two years seeking payments that Myrtle Avenue was not eligible to receive under the New York No-Fault Laws because: (i) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment and Fraudulent Rental Equipment that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (ii) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment and Fraudulent Rental Equipment that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others not presently known; (iii) Myrtle Avenue submitted bills to GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of decisions made by laypersons without proper prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and (iv) to the extent that Myrtle Avenue actually provided Fraudulent Rental Equipment to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the Fraudulent Rental Equipment. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

259.    Dekhkanov and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

260.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills submitted through Myrtle Avenue.

261.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Myrtle Avenue and Dekhkanov**
**(Common Law Fraud)**

262.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in the paragraphs set forth above.

263.    Myrtle Avenue and Dekhkanov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment and Fraudulent Rental Equipment.

264.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment were for reasonable and medically necessary DME when, in fact, the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (ii) in every claim, that the prescriptions for Fraudulent Equipment and Fraudulent Rental Equipment

were for reasonable and medically necessary DME when, in fact, the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iii) in many claims, to the extent that any Fraudulent Equipment were actually provided, that the Fraudulent Equipment were issued based upon proper prescriptions by licensed healthcare providers when, in fact, the Fraudulent Equipment was provided pursuant to decisions made by laypersons who are not legally authorized to prescribe DME; and (iv) in many claims, to the extent that Fraudulent Rental Equipment was actually provided, the charges for Fraudulent Rental Equipment contained in the bills to GEICO misrepresented the permissible reimbursement amount.

265.    Myrtle Avenue and Dekhkanov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Myrtle Avenue that were not compensable under the No-Fault Laws.

266.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $430,000.00 pursuant to the fraudulent bills submitted by the Defendants through Myrtle Avenue.

267.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

268.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Myrtle Avenue and Dekhkanov**
**(Unjust Enrichment)**

269.    GEICO incorporates, as though fully set forth herein at length, each and every allegation contained in the paragraphs set forth above.

270.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

271.    When GEICO paid the bills and charges submitted by or on behalf of Myrtle Avenue for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

272.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

273.    Myrtle Avenue's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

274.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $430,000.00.

## JURY DEMAND

275.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Myrtle Avenue, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Myrtle Avenue has no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against Dekhkanov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $430,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  C. On the Third Cause of Action against Dekhkanov and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $430,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  D. On the Fourth Cause of Action against Dekhkanov and Myrtle Avenue compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $430,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

  E. On the Fifth Cause of Action against Dekhkanov and Myrtle Avenue, more than $430,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: July 26, 2024
   Uniondale, New York

       RIVKIN RADLER LLP


       By: _/s/ Barry I. Levy_
         Barry I. Levy (BL 2190)
         Michael A. Sirignano (MS 5263)
         Michael Vanunu (MV 4167)
         Alexandra Cusano
       926 RXR Plaza
       Uniondale, New York 11556
       (516) 357-3000

       *Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*